# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 16, 2010

Lyle W. Cayce
Clerk

No. 08-20313

GERALD O BAILEY, for himself and on behalf of United States
of America, State of Colorado, and Montezuma County, Board
of Commissioners; MONTEZUMA COUNTY COLORADO; UNITED
STATES OF AMERICA; STATE OF COLORADO

                              Plaintiffs - Appellants

v.

SHELL WESTERN E&P INC, now known as SWEPI LP, doing business
as Shell Western E&P, KINDER MORGAN CO2 COMPANY LP,
formerly known as Shell CO2 Company Ltd; SHELL OIL COMPANY

                              Defendants - Appellees

-------------------------------------------------------------------------------------------------

UNITED STATES OF AMERICA; STATE OF COLORADO;
GERALD O BAILEY; HARRY PTASYNSKI

                              Plaintiffs - Appellants

v.

KINDER MORGAN CO2 COMPANY LP, A Texas limited partnership;
RICHARD TIMOTHY BRADLEY

                              Defendants - Appellees

-------------------------------------------------------------------------------------------------

No. 08-20313

HARRY PTASYNSKI

Plaintiff - Appellant

v.

KINDER MORGAN GP INC

Defendant - Appellee

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before JONES, Chief Judge, and GARZA and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

In 1998, Shell Western E&P Inc. ("Shell") sued Gerald Bailey in Texas state court for a declaration regarding the proper calculation method for royalties on carbon dioxide ("$CO_2$") in the McElmo Dome. Bailey counterclaimed. In 2005, the case was removed to federal court in the Southern District of Texas. The District of Colorado then transferred a similar action, *Ptasynski v. Kinder Morgan G.P., Inc.*, to the Southern District of Texas, where it was consolidated with the Shell case. The district court granted summary judgment in favor of Shell, and Bailey and Ptasynski appealed. We AFFIRM.

## I. FACTUAL BACKGROUND[1]

In the 1970s, due to the rising costs of oil, petroleum companies began to investigate the use of $CO_2$ to increase oil output from older fields. They discovered that when $CO_2$ is injected under sufficient pressure into an older field, it mixes with oil underground, dislodging it from the surrounding rock and

---

[1] The factual background of this case, set forth by this Court in 2002, remains the same. *See Ptasynski v. Shell Western E&P, Inc.*, No. 99-11049, 2002 WL 32881277, at *1 (5th Cir. 2002) ("*Ptasynski I*").

enhancing its recovery. This process is known as tertiary or enhanced oil recovery ("EOR"). Oil fields in West Texas were considered prime candidates for EOR.

The largest $CO_2$ field capable of supplying these West Texas fields was the McElmo Dome area, located in Montezuma and Dolores counties, Colorado. Together, Shell and Mobil Producing Texas & New Mexico Inc. ("MPTN") owned 87% of the total working interest in the McElmo Dome area. Shell and MPTN believed that the abundant $CO_2$ reserves of the McElmo Dome area could be harvested more efficiently if the area was operated as a single unit. A partnership was formed to construct, own, and operate a 500-mile pipeline that would carry $CO_2$ from McElmo Dome to fields in West Texas.

Shell filed an application with the Colorado Oil & Gas Commission ("Commission") to operate the McElmo Dome area as a single unit. The Commission preliminarily approved Shell's application, but required Shell to obtain the consent of 80% of the non-cost bearing royalty interest owners. In order to obtain such consent, Shell sent a package of materials to the royalty interest owners. The package included: 1) a brochure entitled "A Program for Unit Operations," which was designed to provide an overview of the project; 2) the Unit Agreement for the proposed McElmo Dome Unit; and 3) a ratification form by which the royalty interest owners could manifest their assent to the Unit Agreement. The brochure contained information in the form of questions and answers. Among these was the following:

> "Will the royalty owners of interest in this unit have to pay for the pipeline, transportation or injection of $CO_2$ in West Texas? No."

Bailey and Ptasynski are both independent geologists with decades of experience in the oil and gas industry. Each holds overriding royalty interest in the McElmo Dome Unit, and each received Shell's package and signed and returned the ratification form. Ultimately, Shell obtained the consent of 92.5%

3

No. 08-20313

of the total royalty interest. As a result, the McElmo Dome Unit became effective and production of $CO_2$ began in December 1983.

Bailey and Ptasynski have been receiving royalties from the McElmo Dome Unit production since 1984. Such royalties were based on the $CO_2$'s value at the "tailgate" of the McElmo Dome plant, before being transported via pipeline to West Texas. Shell determined this value by subtracting the cost of transportation from the delivered sales price.

## II. PROCEDURAL HISTORY

The parties have a long and tortured history of litigation over payment of royalties flowing from the McElmo Dome.

### A. Previous Cases

#### 1. *Class Actions*

In 1996, the $CO_2$ Coalition—seventy owners of varying interests in McElmo Dome—brought a putative class action against Shell, Kinder Morgan, Mobil, and Cortez Pipeline in Colorado federal district court. In 2000, three other class actions were filed in that court by classes of (a) land owners, (b) royalty owners, and (c) non-operating working interest owners. In September 2001, the four cases were settled. Ninety-six percent of the royalty interest owners joined in the settlement

Both Bailey and Ptasynski declined to join in the settlement, instead filing cases in the Northern District of Texas in 1997.

#### 2. *Bailey I*

Bailey sued Shell in 1997, asserting state law claims and one federal claim: that the 1099 tax forms Shell sent them were fraudulent and violated 26 U.S.C. § 7434. *Bailey v. Shell Western E&P, Inc.*, No. 3-97-0518-R, 1998 WL 185520, at *1 (N.D. Tex. Apr. 14, 1998). The district court held the tax claim was not viable and dismissed it with prejudice. *Id.* at *3. The district court declined

to exercise supplemental jurisdiction over the state law claims. *Id*. This Court affirmed. *Bailey v. Shell Western E&P, Inc.*, 170 F.3d 184 (5th Cir. 1999).

### 3. *Ptasynski I*

Ptasynski sued Shell and Mobil on the same theories as Bailey, also in 1997. The district court dismissed the tax fraud and fraudulent concealment claims on summary judgment. *Ptasynski v. Shell Western E&P, Inc.*, No. 3:97-CV-1208-R, 1999 WL 423022, at *8 (N.D. Tex. June 16, 1999). After a bench trial, the court ruled for the defendants on all but the negligent misrepresentation and declaratory judgment claims. This Court rendered judgment entirely for the defendants. *Ptasynski I*, 2002 WL 32881277, at *14.

## B. This Case

### 1. *The Original Declaratory Action*

This lawsuit began in 1998 as a declaratory judgment action in state court in Harris County, Texas. Shell sued Bailey for a declaration that it had been paying royalties properly. Bailey asserted state law counterclaims, including breach of contract, fraud, and breach of fiduciary duty. By March 2001, the state court had resolved all issues by summary judgment in favor of Shell except the fraud-based counterclaims.

Meanwhile, other cases about McElmo Dome $CO_2$ royalties were pending against Shell in the statutory probate court of Denton County, Texas. In March 2001, the probate judge took this case under section 5B of the Texas Probate Code. In August 2002, the Texas Supreme Court held the transfer was void and returned the case to Harris County. *In re SWEPI, L.P.*, 85 S.W.3d 800 (Tex. 2002). The case was then abated until March 2004.

In June 2004, Bailey filed his Eighth Amended Counterclaims in this case, alleging False Claims Act ("FCA") claims substantively identical to those he asserted in a lawsuit filed in Colorado in April 2004 (the "First Colorado Lawsuit"). The Eighth Amended Counterclaims were filed under seal. The state

court unsealed the Eighth Amended Counterclaims in November 2004, after the government declined to intervene.

On March 24, 2005, Bailey removed the declaratory judgment action from state court to the Federal District Court for the Southern District of Texas.

2. *The First Colorado Lawsuit*

In April 2004, Bailey and Ptasynski filed the First Colorado Lawsuit in the Federal District Court for the District of Colorado, a sealed action about the same royalty issues at issue in Texas state court. They asserted individual claims and *qui tam* FCA claims for the United States and allegedly for Colorado and Montezuma County, Colorado. The case remained sealed until April 2005.

In May 2005, the Colorado district court ordered the First Colorado Lawsuit transferred to the Southern District of Texas. *United States v. Kinder Morgan Co.*, No. 04-CV-00716-WDM, 2005 WL 3157998, at *3 (D. Colo. Nov. 21, 2005). After the Colorado court's transfer of the First Colorado Lawsuit to Texas, Bailey and Ptasynski, in December 2005, petitioned for mandamus in the Tenth Circuit. *Ptasynski v. Kinder Morgan G.P., Inc.*, 220 F. App'x 876 (10th Cir. 2007). Mandamus and certiorari were denied.

3. *Proceedings in the Southern District of Texas*

Upon removing the declaratory judgment action from state court to the Southern District of Texas in March 2005, Bailey filed under seal an *ex parte* motion to transfer venue to Colorado. The district court did not transfer the case, instead ordering Bailey to move to transfer the year-old First Colorado Lawsuit to Texas.

Bailey then petitioned the Fifth Circuit for mandamus based on the district court's refusal to transfer this case to Colorado. This Court summarily denied mandamus; the Supreme Court denied certiorari. In July 2005, Bailey and Ptasynski also unsuccessfully sought an anti-suit injunction in the First Colorado Lawsuit, trying to shut down this Texas case.

Once the First Colorado Lawsuit's transfer was final, Ptasynski tried to voluntarily dismiss his claims without prejudice. The district court declined to dismiss the case. When it was clear that litigation was continuing, Ptasynski refused service copies of documents sent by mail. The district court then granted summary judgment on all issues in favor of Shell on April 22, 2008.

## C. Additional Litigation

Ptasynski filed yet another lawsuit in Colorado in April 2006. The case was promptly transferred to Texas. Ptasynski both voluntarily dismissed his claims and appealed the transfer. The appeal was dismissed as moot. *Ptasynski v. Kinder Morgan G.P., Inc.*, 220 F. App'x 876 (10th Cir. 2007).

## III. DISCUSSION

Bailey and Ptasynski appeal the district court's grant of summary judgment in favor of Shell. They raise claims based on jurisdiction, choice-of-law determinations, Texas law, and discovery rules. Ptasynski raises two claims on appeal: (1) his voluntary dismissal under Federal Rule of Civil Procedure 41(a) immediately divested the district court of jurisdiction, and (2) the district court improperly applied the substantive law of Texas rather than Colorado law. Bailey appeals on two jurisdictional and three non-jurisdictional grounds: (1) the district court lacked jurisdiction pursuant to the local action doctrine and the FCA's first-to-file rule; (2) the district court erred in concluding that Bailey is not an "original source" under the FCA's jurisdictional requirements; (3) the district court improperly applied the substantive law of Texas rather than Colorado law; (4) the district court erred by granting summary judgment on Bailey's claims under Texas law; and (5) the district court incorrectly failed to exclude evidence that allegedly was not produced by Shell as required under Federal Rule of Civil Procedure 26.

No. 08-20313

## A. Refusal to Dismiss under Rule 41(a)(1)(A)

Ptasynski argues that the district court erred in entering summary judgment because he filed a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a).[2] He maintains that the filing of the Rule 41(a) dismissal immediately divested the district court of jurisdiction. This question of law is reviewed *de novo. Abraham v. State Farm Mut. Auto. Ins. Co.*, 465 F.3d 609, 611 (5th Cir. 2006).

Rule 41(a)(1)(A)(i) provides that without a court order,

a plaintiff may dismiss an action without a court order by filing: a notice of dismissal before the opposing party serves an answer or motion for summary judgment. . .

FED. R. CIV. P. 41(a)(1)(A)(i).

After Ptasynski filed the notice of voluntary dismissal, Shell filed a response in opposition to the dismissal and Ptasynski did not file a reply. The district court then conducted a conference on January 18, 2006. Although the district court did not issue an order specifically denying dismissal, the record from the conference reflects the district court's reasoning and ruling:

The court: . . . [T]hey haven't withdrawn until I have blessed their withdrawal. This is a very unusual suit. This is not one party and another party and one party abandoning it. This is one party vigorously litigating it in three or four forums and then we transferred somebody else trying to cut and run, only to refile again.

. . .

Counsel for Ptasynski: . . . [T]hey told me they wanted to be dismissed totally from the case and directed me to file the notice of dismissal, which I did.

The court: All right. Well, you need to do one more thing. Tell them that they are not dismissed. The only way they may be dismissed is if they dismiss their claims against everybody and everything in

---

[2] Ptasynsky's Notice of Voluntary Dismissal referred only to Rule 41(a). The Court notes that Ptasynsky's voluntary dismissal is governed by Rule 41(a)(1)(A)(i).

connection with the McElmo Dome with prejudice, or they commit that if they ever file anything again, they file it here. But they can't do that and I'm not confident they are doing it.

Counsel for Ptasynski: Your Honor, they are doing it.

The court: . . . [T]hey will be in here until I get a commitment from them about what their plans are for this—and by this litigation, I don't mean any particular civil action number. I mean the guerilla warfare that's gone on for a decade about the McElmo Dome. So I'll be happy to dismiss them with prejudice, but I'm not going to let them sneak off from this case after everything that's gone on, only to file it in Panola County, Mississippi next week. And so you need to convey that to them that they are active members of this case until I dismiss them.

Generally, Rule 41(a)(1) dismissal results in immediate termination of the suit. *Harvey Specialty & Supply, Inc. v. Anson Flowline*, 434 F.3d 320, 324 (5th Cir. 2005) ("The plaintiff has an 'absolute right' to a Rule 41(a)(1) dismissal, and '[t]he effect of [a Rule 41(a)(1)] dismissal is to put the plaintiff in a legal position as if he had never brought the first suit.'") (internal citations omitted). Dismissal under Rule 41(a)(1) is "a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court." *Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963).

The district court erred in its treatment of Ptasynski's attempted Rule 41(a)(1) dismissal by imposing the condition that the dismissal be with prejudice. In light of Ptasynski's claims pursuant to the FCA, however, that error is harmless.

The FCA provides that:

A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

31 U.S.C. § 3730(b). Thus, Ptasynski could not dismiss his *qui tam* action without written consent of the court and the Attorney General, which he did not obtain.

Ptasynski asks the Court to carve out an exception from the § 3730(b) consent requirement for plaintiffs who wish to withdraw from multi-plaintiff *qui tam* actions. The consent requirement for dismissal of a *qui tam* action safeguards the government's interests; it "encourag[es] the government to monitor relators' actions and step in when a relator is not acting in the best interest of the public." *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997). "For more than 130 years, Congress has instructed courts to let the government stand on the sidelines and veto a voluntary [dismissal]. It would take a serious conflict within the structure of the FCA or a profound gap in the reasonableness of the provision for us to be able to justify ignoring this language." *Id.* at 160. Like the *Searcy* court, here "we can find neither." *Id.*

As Ptasynski argues, the dismissal of one plaintiff from a multi-plaintiff case will not result in dismissal of the entire action. But dismissal of one plaintiff may nonetheless impair the government's interests even where another plaintiff remains in the suit to litigate on behalf of the government. Additionally, seeking the written consent of the government and the court in no way constitutes a significant burden for a plaintiff—if the government's interests are not impacted, then consent will surely be freely granted. The language of § 3730(b) "is as unambiguous as one can expect" and we will not erode the statutory protection of the government's interest simply for the sake of convenience. *Id.* at 159.

Nor could Ptasynski have dismissed just his individual claims, as he now suggests. Rule 41(a) dismissal only applies to the dismissal of an entire action—not particular claims. *Exxon Corp. v. Md. Cas. Co.*, 599 F.2d 659, 662 (5th Cir. 1979) ("[W]hen Rule 41(a) refers to Dismissal of an 'action', there is no reason to suppose that the term is intended to include the separate claims which make up

an action. When Dismissal of a claim is intended, as in Rule 41(b), that concept is spelled out in plain language.").

## B. Denial of Transfer to Colorado

Bailey claims that the Southern District of Texas lacked subject matter jurisdiction over this case and erred by denying transfer to the District of Colorado. When addressing a determination of subject matter jurisdiction, we review application of law *de novo* and disputed factual findings for clear error. *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009).

### 1. *Jurisdiction under the FCA*

Bailey asserts that the District of Colorado had sole jurisdiction over the FCA action pursuant to the first-to-file bar of § 3730(b)(5), and the Southern District of Texas therefore lacked subject matter jurisdiction.

The FCA provides:

> Any action under section 3730 may be brought in any judicial district in  which  the  defendant  or,  in  the  case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred.
> . . .
>
> When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

31 U.S.C. §§ 3732(a), 3730(b)(5).

Shell filed this lawsuit in Texas state court in 1998, Bailey and Ptasynski filed the Colorado lawsuit alleging *qui tam* claims in April 2004, and Bailey added *qui tam* counterclaims in this case in November 2004. Although the *qui tam* action was filed in Colorado prior to being added to the Texas case, the district courts did not err in determining that the Southern District of Texas was a proper forum for the FCA action. We agree with the reasoning of the District of Colorado court when ordering the transfer to the Southern District of Texas:

the first-to-file bar "does not apply when the same plaintiff, for whatever reason, files the same claim in a different jurisdiction as the Plaintiffs did here." *Kinder Morgan Co.*, 2005 WL 3157998, at \*2. As we recently noted in *Branch Consultants*, if an FCA claim "ha[s] already been filed by *another*, the district court lack[s] subject matter jurisdiction . . . ." 560 F.3d at 376 (emphasis added).

The two competing policy goals of § 3730(b) are to encourage whistleblowing and to discourage opportunistic behavior. *Id*. Neither of the statutory purposes are served when the same plaintiff makes the same claim in a different jurisdiction.[3] *Kinder Morgan Co.*, 2005 WL 3157998, at \*2. We therefore construe the first-to-file bar of § 3730(b)(5) as inapplicable to one plaintiff who files the same claim in multiple jurisdictions.

### 2. *28 U.S.C. §§ 1392, 1631, and the Local Action Doctrine*

Bailey asserts that the Southern District of Texas lacked subject matter jurisdiction pursuant to the local action doctrine,[4] and § 1631 therefore required transfer of the case back to Colorado.

Section 1631 provides that:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed . . .

[3] In fact, Plaintiffs' attempts at forum shopping constitute the opportunistic and parasitic behavior that the FCA seeks to preclude. *See Branch Consultants*, 560 F.3d at 376 ("the provisions seek to discourage opportunistic plaintiffs from filing parasitic lawsuits"). In the District of Colorado, the plaintiffs relied on the prohibition of § 3730(b)(5) to resist the motion to transfer from Colorado to Texas. Yet they also knowingly violated the same prohibition when filing their *qui tam* counterclaim in the Texas case, for the apparent purpose of obtaining federal jurisdiction.

[4] This Court has noted that questions remain as to whether the local action doctrine runs to the jurisdiction or the venue of a court. *Trust Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1149 n. 7 (5th Cir. 1992). The Court need not resolve these questions for purposes of this appeal.

28 U.S.C. § 1631.

The local action doctrine requires that "a local action involving real property can only be brought within the territorial boundaries of the state where the land is located." *Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 287 (5th Cir. 1987) (citing *Ellenwood v. Marietta Chair Co.*, 158 U.S. 105, 107 (1895)). The question of whether an action is local or transitory depends on the law of the forum state. *Id*. at 287-88.

Under Texas law, actions that seek adjudication of title to real property are local in nature and must be brought where the land is situated. *Id*. at 287; *Miller v. Miller*, 715 S.W.2d 786, 788 (Tex. App.—Austin 1986, writ ref'd n.r.e.). "It is well-settled that a royalty interest in an oil and gas lease is an interest in real property, held to have the same attributes as real property." *Kelly Oil Co. Inc. v. Svetlik*, 975 S.W.2d 762, 764 (Tex. App.—Corpus Christi 1998, pet. denied); *see also Hayes*, 821 F.2d at 288 ("Under Texas law, it is clear that an interest in land under an oil and gas lease constitutes real estate, and that Hayes' action to terminate Gulf's interest [in a lease] is an action to try title to real property located in Colorado."). When applying the local action doctrine to disputes surrounding royalty interests in oil and gas leases, however, Texas courts distinguish actions that involve questions of title from those that lack "any legitimate dispute regarding the ownership of the interests held in the real property." *Kelly Oil Co. Inc.*, 975 S.W.2d at 764; *see, e.g.*, *Hartman v. Sirgo Operating, Inc.*, 863 S.W.2d 764, 766-67 (Tex. App.—El Paso 1993, writ denied) ("The trial court was not required to determine ownership of land in New Mexico nor was any relief sought requiring the transfer of title to land in New Mexico. The declaratory judgment suit was only seeking to determine obligations under a contract . . .").

Bailey and Ptasynski's claims do not require any adjudication of title to real property and therefore do not fall within the scope of the local action

13

doctrine. The claims alleged in Ptasynski's Complaint and Bailey's Amended Complaint reveal that ownership of the royalty interests was never at issue. Both Ptasynski and Bailey principally claimed that Shell violated its obligations under the Unit Agreement by improperly deducting transportation charges from royalty payments. Nor does either appellant seek any relief that would require transfer of title to royalty interests. Additionally, Shell never claims that Bailey or Ptasynski do not own the overriding royalty interests in the McElmo Dome Unit that form the basis for this litigation. Thus, the parties do not contest title or ownership of interest in mineral rights; the suit "was only seeking to determine obligations under a contract." *Hartman*, 863 S.W.2d at 767. Because parties only dispute Shell's obligations under a contract related to real property, the local action rule does not control.

Bailey also claims that 28 U.S.C. § 1392 required transfer of the case to Colorado. Section 1392 provides that "any civil action, of a local nature, involving property located in different districts in the same State, may be brought in any of such districts." 28 U.S.C. § 1392. As we have just determined, this action is not "of a local nature," therefore § 1392 does not apply. Regardless, § 1392 governs intrastate transfers of venue rather than interstate transfers.

## C. *Res Judicata*

The district court determined that Ptasynski's claims were barred by *res judicata* and Ptasynski has not appealed that determination. Issues not briefed on appeal are waived. *Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997). Because *res judicata* "constituted an independent ground for dismissal below, appellant [was] required to raise it to have any chance of prevailing in this appeal." *Atwood v. Union Carbide Corp.*, 847 F.2d 278, 280 (5th Cir. 1988). The dismissal of all of Ptasynski's claims is therefore affirmed on the basis that he waived appeal of the *res judicata* determination.

No. 08-20313

## D. Application of Texas Law[5]

Bailey argues that the district court committed reversible error by applying Texas law rather than Colorado law. This Court reviews conflicts of law questions *de novo*, but the district court's factual determinations are reviewed for clear error. *Abraham*, 465 F.3d at 611.

Federal courts apply the forum state's conflicts-of-law rules to determine what law governs state-law claims. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Texas courts initially determine whether there is a conflict between Texas law and the other potentially applicable law. *See Sava Gumarskain Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 314 (Tex. App.—Dallas 2004, no pet.) ("[W]e should first determine if the laws are in conflict. If the result would be the same under the laws of either jurisdiction, there is no need to resolve the choice of law question."); *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711-12 (Tex. App.—Fort Worth 2003, no pet.) ("In the absence of a true conflict, we need not undertake a choice-of-law analysis."). Where there is a conflict of laws, Texas follows the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 188 to determine the law applicable to a contract dispute. *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex. 1997). Section 188(2) states the following:

> In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and

---

[5] Ptasynski's appeal raises the same choice of law arguments propounded by Bailey. However, because Ptasynski's dismissal is affirmed on *res judicata* grounds, the Court addresses choice of law issues only with respect to Bailey.

15

(e) the domicile, residence, nationality, place of
incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative
importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971). Application of the most significant relationship analysis turns on the qualitative nature of the particular contacts with a state rather than the mere number of those contacts. *Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979).

### 1. *Fiduciary Duties of Operators*

Bailey points to only two areas in which, he argues, Texas and Colorado law would arrive at different outcomes on his claims: fiduciary duty and post-production costs.

Bailey first asserts that Colorado and Texas law conflicts regarding the imposition of fiduciary duties on operators of oil, gas, and $CO_2$ units. "Texas law has never recognized a fiduciary relationship between a lessee and royalty owners." *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998). Nor have Texas courts ever stated that such a fiduciary relationship would never be recognized. *See In re Bass*, 113 S.W.3d 735, 744 (Tex. 2003) ("[A] grantee, after executing a mineral lease, owes a duty of the utmost fair dealing to protect the amount of the grantor's royalty."); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) ("[W]hile a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit.").

Colorado's law is similar and does not conflict with that of Texas. As the Tenth Circuit has interpreted Colorado law, "a lessee-lessor relationship, even if it encompasses the operation of an oil and gas unit, does not automatically create fiduciary responsibilities," but "that a fiduciary duty does not *necessarily* arise from a lessee-lessor relationship does not mean a fiduciary duty *never*

16

arises from such a relationship." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1162 (10th Cir. 2000).

2. *Contractual Allocation of Post-Production Costs*

In his second conflict of laws argument, Bailey argues that, unlike Texas law, Colorado law requires that post-production costs incurred to make the gas marketable are to be borne solely by the lessees.

Where leases are silent with respect to the allocation of costs, "the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners are not obligated to share in these costs." *Rogers v. Westerman Farm Co.,* 29 P.3d 887, 902 (Colo. 2001) (quoting *Garman v. Conoco*, 886 P.2d 652, 659 (Colo. 1994)). After concluding that the "deductability of costs is determined by whether gas is marketable, not by the physical location or condition of the gas," the Colorado Supreme Court then defined marketability. *Id*. at 900-01. The court adopted the following definition:

> Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace. The determination of whether gas is marketable is a question of fact, to be resolved by a fact finder.

*Id*. at 906. Thus, the working interest owner must bear the costs of getting the gas to a marketable condition and marketable location, but once the gas is marketable, additional costs to improve or transport the gas must be shared proportionately between the working interest owner and the royalty interest owner.

By contrast, in Texas "[a]lthough it is not subject to the costs of production, royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996). Therefore, Colorado and Texas

law conflict with respect to the default rule for allocation of post-production costs incurred *before* gas is marketable.

### 3. *Most Significant Relationship Factors*

Because Texas and Colorado law conflict in areas relevant to Bailey's claims, we proceed to analyze the most significant relationship factors. On balance, we conclude that the most significant relationship factors weigh in favor of applying Colorado law.[6]

Bailey acquired the leases in the McElmo Dome via instruments executed in various states, including Arizona, Georgia, Colorado, Ohio, and Illinois. The assignments from Bailey to Bridwell Oil were executed in Colorado. The assignments from Bridwell Oil to Shell, that created Bailey's overriding royalty interests, were executed in Texas. The contract most pertinent to this dispute, the Unit Agreement, was sent by Shell from Texas to New Mexico, where it was ratified by Bailey in 1983. However, "[s]tanding alone, the place of contracting is a relatively insignificant contact." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e.

To the extent that negotiations occurred, they took place in the states where the parties signed the agreements—Shell negotiated from Texas, and Bailey from Colorado, Texas, and New Mexico. The place of negotiation, however, "is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail . . . ." *Id.*

The place where the contract was to be performed is the most important factor under the most significant relationship test, and may be "conclusive in determining what state's law is to apply." *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 54 (Tex. 1991) (quoting *DeSantis v. Wackenhut*, 793 S.W.2d

---

[6] Neither the Unit Agreement nor the leases incorporated choice of law provisions applicable to Bailey.

670, 679 (Tex. 1990)). Shell argues that the performance at issue is payment by Shell: Shell calculates value and makes payments from Texas; Bailey has received payments in Texas, Colorado, and New Mexico. But the gas interests governed by the assignments, leases, and Unit Agreement are located in Colorado and production necessarily takes place in Colorado. More specifically, the disputed transportation costs are incurred in moving the gas from Colorado to Texas.

With respect to the location of the subject matter of the contract, the place of production is undisputedly the McElmo Dome in Colorado. Bailey argues that this factor weighs so heavily in his favor as to be dispositive of the choice of law analysis. Shell claims that the actual dispute is money, not real property, and the valuation of royalties takes place in Texas. The Restatement (Second) of Conflicts of Laws § 188 comment (e) notes that:

> When the contract deals with a specific physical thing, such as land . . . the state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing . . . as important. Indeed, when the thing . . . is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing . . . was located would be applied to determine many of the issues arising under the contract.

Moreover, in the 1998 declaratory judgment action filed by Shell in state court, which ultimately resulted in this appeal, Shell alleged that "the determination of the proper method of royalty calculation in this case is a question of Colorado law" because "[t]he lands covered by Defendants' overriding royalty interests are located in Colorado" and "[t]he $CO_2$ on which royalty is paid is produced in Colorado." We therefore conclude that this factor weighs in favor of applying Colorado law.

No. 08-20313

At the time that he signed the Unit Agreement, Bailey resided in New Mexico; at the time this lawsuit was initially filed by Shell, Bailey resided in Texas; Bailey currently resides in Colorado. Shell's principal office is in Texas.

"Although the parties did not express a choice of what state's law would govern their agreement, they should have expected that [Colorado] law would at least be invoked." *Maxus Exploration Co.*, 817 S.W.2d at 57. Here, the third and fourth factors are ultimately determinative of the choice of law issue. Under the most significant relationship test, Colorado law governs Bailey's state law claims. The district court erred by summarily concluding—without applying the Texas choice of law analysis—that "[t]his case will be decided under Texas law."

**E. State Law Claims**

Bailey further claims that the district court improperly granted summary judgment on his claims of breach of contract, fraud, breach of fiduciary duty, civil theft, unfair practices, civil conspiracy, and antitrust. Having concluded that Colorado, rather than Texas law applies, we evaluate Bailey's state law claims *de novo* under Colorado law, and conclude that the choice of law error was harmless because under Colorado law the outcome would be no different.[7]

1. *Breach of Contract*

As discussed above, Colorado law and Texas law differ in their default rules for allocation of post-production costs incurred before gas is marketable where a lease is silent with respect to the allocation of such costs. Thus, the difference in Texas and Colorado law is determinative only if the leases at issue here are silent.

---

[7] All of Bailey's claims essentially boil down to a claim for breach of contract based on an alleged miscalculation of royalties owed on the gas produced from the McElmo Dome. Three courts, including this one, have reached basically the same conclusions. *See Ptasynski I*, No. 99-11049, 2002 WL 32881277, at *14 (5th Cir. Feb. 13, 2002); *Ptasynski v. Shell Western E&P, Inc.*, No. CA 3:97-CV-1208-R, 1999 WL 423022, at *8 (N.D. Tex. June 16, 1999); *Shell Western E&P, Inc. v. Bailey,* No. 98-28630 (215th Dist. Ct., Harris County, Tex. July 7, 2000).

No. 08-20313

Applying Texas law,[8] the district court concluded that "[t]he leases in this case are not silent. They were incorporated into the unit agreement and say that transportation costs may be deducted." Bailey does not assert that the leases at issue here are silent under Colorado or Texas law, nor does he advance alternate interpretations of the language contained in the leases; he in fact offers no discussion whatsoever of the language of the leases. Here there are 62 lengthy and detailed leases at issue, and "it is not the function of the Court of Appeals to comb the record for possible error, but rather it is counsel's responsibility to point out distinctly and specifically the precise matters complained of, with appropriate citations to the page or pages in the record where the matters appear." *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989); *see also* FED. R. APP. P. 28(a)(9)(A).

Further, neither the Unit Agreement nor the brochure sent by Shell changed the terms of the royalty valuation. As *Ptasynski I* concluded,

> the Unit Agreement expressly and unambiguously provided that it did not change how working interest owners settle for royalty interests and such settlements would be governed by and in accordance with existing contracts, laws and regulations . . . The brochure does not purport to either be contractual or to alter the Unit Agreement or the existing contracts which governed royalty settlement, and it is at most representational . . ."

*Ptasynski I*, 2002 WL 32881277, at *11. Therefore the district court did not err by granting summary judgment on the breach of contract issue.

---

[8] In *Rogers v. Westerman Farm Co.*, the Colorado Supreme Court decided whether certain leases were silent, or provided for the allocation of post-production costs between the working interest owner and the royalty interest owner. 29 P.3d at 887. The leases contemplated that royalties were to be computed "at the well." *Id.* at 891. The court concluded that the leases were "silent as to the allocation of all costs, including transportation costs." *Id.* at 906. The court determined that the leases were silent because they failed to "describe either the costs or the allowable deductions," did not "[contemplate] the sale of gas anywhere other than at the wellhead," and because "the intended meaning of the clause is unclear." *Id.* at 897-98.

No. 08-20313

2. *Fraud*

Bailey's fraud-based claims are grounded in representations made by Shell in the brochure that it sent to royalty owners regarding the Unit Agreement. Bailey asserts that the brochure that Shell sent to him along with the documents for approval of the Unit Agreement contained a statement that Shell know to be false, and that Shell intended for him to rely on.[9]

These claims lack merit because, as discussed above, the Unit Agreement provided that it did not alter existing leases that governed royalty settlement. As the district court stated, the brochure was superceded the Unit Agreement that was signed by Bailey. Thus Shell did not—through its brochure or any other manner—make false representations[10] to Bailey.

3. *Breach of Fiduciary Duty*

Under Colorado law "[o]rdinarily, the mere reserving of an overriding royalty in the assignment of an oil and gas lease does not create a confidential or fiduciary relationship." *Atl. Richfield Co.,* 226 F.3d at 1162 (quoting *Degenhart v. Gold King Petroleum Corp.*, 851 P.2d 304, 306 (Colo. Ct. App. 1993)). A fiduciary duty flowing from an overriding royalty interest might result

---

[9] The brochure contained the following statements:
- Who will pay for installing and operating this program? All installation and operating costs will be paid by the working interest owners. There will be no charges to the royalty owners.
- What is the price for the CO2? The sales price provided in the contract with the Denver Unit is 90¢ per thousand cubic feet as of December 1, 1981. This price will fluctuate up or down based on the price of west Texas crude. Based on December, 1982 oil prices, the sales price is about 85¢ per thousand cubic feet.
- Will the royalty owners of interest in this Unit have to pay for the pipeline, transportation or injection of CO2 in west Texas? No.

[10] Under Colorado law, to establish fraud a plaintiff must prove that: (1) a fraudulent misrepresentation of material fact was made; (2) the plaintiff relied on the misrepresentation; (3) the plaintiff had the right to rely on, or was justified in relying on, the misrepresentation; and (4) the reliance resulted in damages. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994) (citing *Zimmerman v. Loose*, 425 P.2d 803, 807 (Colo. 1967).

22

from "a close relationship between the parties, bad faith on the part of the lessee, or specific language of the assignment protecting the overriding royalty interest." *Degenhart*, 851 P.2d at 306 (cited with approval by *Garman v. Conoco, Inc.*, 886 P.2d 652, 659 n.23 (Colo. 1994)). Shell owes no fiduciary duty to Bailey—they are actors in an arm's length transaction—so his claim for breach of fiduciary duty cannot survive.

4. *Antitrust*

Next, Bailey fails to meet even the most basic of antitrust requirements— he has suffered no antitrust injury and, accordingly, lacks antitrust standing. *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). If Shell were to raise the price of gas, Bailey would benefit because his royalty payment would increase. As the district court noted, Shell's charging in parallel with other unit operators is a "conspiracy," but it is a legitimate one approved by the State of Colorado. *Bailey v. Shell Western E&P, Inc.*, 555 F. Supp. 2d 767, 776 (S.D. Tex. 2008).

5. *Civil Theft*

Bailey alleges that Shell committed civil theft under § 18-4-401 of the Colorado Revised Statutes.[11] To maintain an action for civil theft, the owner of

---

[11] The relevant portion of COLO. REV. STAT. § 18-4-401 states:
(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:
> (a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or
> (b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or
> (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use and benefit; or
> (d) Demands any consideration to which he is not legally entitled as a condition of restoring the thing of value to the other person.

The Rights in Stolen Property Statute, § 18-4-405 of the Colorado Revised

property must prove all of the statutory elements of theft, defined as "knowingly obtain[ing] or exercis[ing] control over anything of value of another without authorization, or by *threat or deception*, and ... [i]ntend[ing] to deprive the other person permanently of the use or benefit of the thing of value." COLO. REV. STAT. § 18-4-401(1)(a); *West v. Roberts*, 143 P.3d 1037, 1040 (Colo. 2006) (emphasis added). "Theft by deception as set forth in subsection 18-4-401(1)(a) requires proof that the victim relied on a swindler's misrepresentations, which caused the victim to part with something of value." *Id.* (citing *People v. Warner*, 801 P.2d 1187, 1189-90 (Colo. 1990)).

Bailey does not assert theft by threat, and a claim of theft by deception fails as a matter of law because it hinges on the alleged misrepresentations made by Shell. For the reasons discussed above, the statements in the brochure were not misrepresentations. Therefore, the district court correctly held that here the alleged underpayment of an amount due does not result in a theft.

6. *Conspiracy*

To the extent Bailey alleges that Shell engaged in a conspiracy to commit fraud, breach of fiduciary duty, or anything else, his claim fails because it is not supported by an independent unlawful act. Bailey failed to demonstrate a fact issue as to whether Shell committed "an unlawful overt act,"[12] therefore the civil conspiracy claim also fails as a matter of law.

---

Statutes, states that "[a]ll property obtained by theft, robbery, or burglary shall be restored to the owner."

[12] The elements for a civil conspiracy claim were set forth by the Colorado Supreme Court in *Nelson v. Elway*: "To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result." 908 P.2d 102, 106 (Colo. 1995).

## F. Original Source under the FCA

The district court granted summary judgment on Bailey's FCA claims on the basis that Bailey did not carry his burden to prove that the allegations in his FCA claims were not based upon prior, public disclosures—or, if they were, that he was an original source of the information. This court reviews a district court's grant of summary judgment *de novo. Kimberly-Clark Corp. v. Factory Mut. Ins. Co.*, 566 F.3d 541, 545 (5th Cir. 2009).

The FCA provides that:

> No court shall have jurisdiction over an action under this section . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information . . . 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). Here, the claim is based primarily on public information and Bailey is unable to offer evidence that he was an original source. Therefore the district court appropriately granted summary judgment on the FCA claims.

## G. Disclosures Under Rule 26

Bailey finally argues that the district court's grant of summary judgment improperly considered evidence that should have been excluded under Federal Rules of Civil Procedure 26 and 37. Rule 37 provides in relevant party that a party who fails to disclose information under Rule 26 "shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion, any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1). In evaluating whether a violation of Rule 26 is harmless, and thus whether the district court was within its discretion in considering the evidence, this Circuit considers four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such

prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Research Found. v. Magna Transp.*, 338 F.3d 394, 402 (5th Cir. 2003). Bailey identifies no evidence that Shell failed to disclose and then offered in support of its motion for summary judgment, or that the district court considered in its decision to grant summary judgment. Accordingly, Bailey's argument fails.

## IV. CONCLUSION

For the foregoing reasons, the district court's grant of Shell's motion for summary judgment is AFFIRMED.