# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60310

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2015

Lyle W. Cayce
Clerk

JAMES A. WAGGONER; J.W.W. OIL AND GAS EXPLORATION, INCORPORATED,

Plaintiffs–Appellants

v.

DENBURY ONSHORE, L.L.C.; DENBURY GULF COAST PIPELINES, L.L.C.; DENBURY RESOURCES, INCORPORATED,

Defendants–Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:12-CV-257

Before DENNIS, PRADO, and HIGGINSON, Circuit Judges.

PER CURIAM:*

James Waggoner owns a working interest in a carbon-dioxide well in Mississippi entitling him to a percentage of the proceeds from Denbury Resources, Incorporated's sales of the carbon dioxide. Waggoner sued Denbury and its subsidiaries for antitrust violations and civil conspiracy alleging that Denbury sells the carbon dioxide to its subsidiaries at low prices to decrease

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-60310

the royalties it has to pay. The district court granted summary judgment to Denbury because Waggoner 1) lacked "antitrust injury" for standing purposes and 2) failed to allege the elements of fraud, the underlying tort for his conspiracy claim. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns royalty interests owned by Plaintiffs–Appellants James Waggoner and his family-owned company, J.W.W. Oil and Gas Exploration, Incorporated (collectively "Waggoner"). In 1984, J.W.W. acquired an oil, gas, and mineral lease in Rankin County, Mississippi. Rankin County is the location of a carbon-dioxide ($CO_2$) formation known as the Jackson Dome.

After Shell Western E&P, Incorporated successfully petitioned the Mississippi State Oil and Gas Board to pool the interests in a large tract of land including J.W.W.'s leases, J.W.W. entered into a Farmin Agreement with Shell. Under the agreement, J.W.W. placed its 77 acres into the pooled unit and received a 6.25% overriding royalty interest (ORRI) in the well until payout. At payout, J.W.W. retained the option to convert the ORRI into a 40% working interest.[1] The parties also executed an Operating Agreement that provided that the price for $CO_2$ would be the "volume weighted average price." When the well paid out, J.W.W. exercised its option to convert the ORRI into a working interest. As a working-interest owner, J.W.W. was entitled to take either its proportionate share of the $CO_2$ or its proportionate share of the volume-weighted average price of $CO_2$ that Shell received in the area. J.W.W. chose the latter and later sold this interest to Waggoner.

---

[1] Working interests are cost-bearing interests, unlike ORRIs.

2

No. 14-60310

Shell sold the field unit to Airgas Carbonic Enterprises. Shell also sold several of its enhanced oil recovery (EOR) fields to J.P. Oil. EOR is a process that uses $CO_2$ to enhance oil output from older oil fields. Airgas and J.P. Oil entered into a purchase agreement under which Airgas would sell $CO_2$ to J.P. Oil at an agreed-upon price for use at the EOR fields. They also agreed that the treatment and transport costs would be borne by the owner of the field unit. In 1999, J.P. Oil sold its fields to Defendant–Appellee Denbury Resources, Incorporated. Denbury continued to purchase $CO_2$ from Airgas under the purchase agreement. In 2001, Airgas sold the field unit to Denbury. According to Waggoner, this acquisition made Denbury the owner of "the entire carbon dioxide supply in Mississippi."

In 2012, Waggoner sued Defendants–Appellees Denbury Onshore, LLC, Denbury Gulf Coast Pipelines, LLC, and Denbury Resources, Incorporated (collectively "Denbury"), for, *inter alia*, antitrust violations under Mississippi Code Annotated §§ 75-21-1, 75-21-3(b), and 75-21-3(e) and civil conspiracy. Waggoner alleges that "Denbury Onshore pays the royalty and working interest owners in the Jackson Dome based upon the price Denbury Onshore receives from the Denbury subsidiary for the $CO_2$. Denbury then pipes the $CO_2$ to oilfields . . . to be used by Denbury in tertiary oil recovery operations." Waggoner alleges that "Denbury Onshore 'sells' the $CO_2$ to its subsidiary . . . at an artificially low price . . . and pays its royalty owners based on that artificially low price."

Denbury filed a Motion to Dismiss and for Summary Judgment. The district court granted summary judgment to Denbury on the antitrust claims for lack of antitrust standing and on the civil-conspiracy claim for failure adequately to plead the underlying tort of fraud.

3

No. 14-60310

## II. DISCUSSION

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction to review the district court's final judgment pursuant to 28 U.S.C. § 1291.

This Court reviews de novo a district court's grant of summary judgment, viewing "all facts and evidence in the light most favorable to the non-moving party." *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir. 2013). It applies the same standard as the district court in the first instance. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### A.    Antitrust

A plaintiff has standing to pursue an antitrust suit only if he shows: "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).[2]

---

[2] Although the antitrust claim in this case was brought under Mississippi law, the parties agree that Mississippi antitrust claims are "analytically identical" to federal antitrust claims; therefore, Plaintiffs lack standing to maintain their Mississippi antitrust claim if they lack standing under federal antitrust law. Thus, we analyze their claim under federal law.

No. 14-60310

The principal issue in this case is the second requirement, antitrust injury,[3] which is

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mart, Inc.*, 429 U.S. 477, 489 (1977) (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1975)).[4]

Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market. *See, e.g.*, John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 & n.30 (2014) (collecting cases). But standing is not necessarily limited to this group. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) ("As we have recognized, '[§ 4 of the Clayton Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers . . . .'" (quoting *Mandeville Island Farms, Inc. v.*

---

[3] This antitrust injury requirement of antitrust standing is sometimes confused with "injury to competition[,] . . . which is often a component of substantive liability." *Doctor's Hosp.*, 123 F.3d at 305. In the standing context, injury "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Id.* In this opinion, "antitrust injury" refers only to the antitrust standing requirement.

[4] Both the district court and Waggoner's brief quote the following from *Bell v. Dow Chemical Co.*: "In making the determination, courts may assess several factors: 1) the nature of plaintiff's alleged injury; 2) the directness of the injury; 3) the speculative measure of the harm; 4) the risk of duplicative recovery; and 5) the complexity in apportioning damages." 847 F.2d 1179, 1183 (5th Cir. 1988). While these factors are indeed appropriate in the *overall* standing inquiry, the antitrust-injury standing requirement is analogous to the first *Dow* factor: the nature of the plaintiff's injury. This is evident from *Dow's* citation to *Brunswick* for the proposition that, "[r]egarding the first factor, plaintiff's injury must be the type that the antitrust laws were intended to prevent," *id.*

No. 14-60310

*Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (alteration in original)); *cf. Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986) (extending the antitrust injury requirements of Clayton Act § 4 claims for damages to § 16 claims for injunctive relief).

In *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314 (5th Cir. 2009), this Court addressed an assertion of antitrust standing similar to Waggoner's—decreased fees from the downstream anticompetitive conduct of the payor. Harrah's, which owned two gaming licenses, leased two berths for its riverboat casinos. *Id.* at 316. Pursuant to a settlement agreement, the plaintiff was entitled to a portion of that rent in per-patron fees. *Id.* Harrah's proceeded to sell the casinos, gaming licenses, and interests in the berths to another company, Pinnacle. *Id.* Pinnacle applied to the state regulatory agency to use the two gaming licenses at berths in which the plaintiff had no interest, which would have deprived the plaintiff of all per-patron fees. *Id.* at 317.

The plaintiff sued Harrah's and Pinnacle, alleging, *inter alia*, antitrust violations for dividing the Louisiana casino market. *Id.* at 318. The plaintiff argued that the loss of fees constituted antitrust injury. *Id.* In determining whether this constituted antitrust injury, we analogized to landlord–tenant and supplier–customer law. *Id.* at 320. Noting that these relationships "when terminated or modified by a byproduct of 'downstream' anticompetitive conduct, have rarely been held to inflict antitrust injury," we held that the loss of per-patron fees did not amount to antitrust injury and affirmed the dismissal on antitrust standing grounds. *Id.* at 320–21, 323.

Additionally, we have explicitly held that a royalty-interest owner's alleged injury of decreased royalty payments due to a conspiracy among oil companies is not antitrust injury. In *Bailey v. Shell Western E&P, Inc.*, the

6

holder of an ORRI in $CO_2$ in the McElmo Dome in Colorado brought an antitrust suit against Shell. 609 F.3d 710, 715–16, 727 (5th Cir. 2010). The interest holder's alleged antitrust injury was the decrease in royalty payments resulting from an alleged conspiracy between Shell and other unit operators. *Bailey v. Shell W. E & P, Inc.*, 555 F. Supp. 2d 767, 769, 776 (S.D. Tex. 2008).[5] We reasoned that "if Shell were to raise the price of gas [on which the royalty payments were based] Bailey would benefit because his royalty payments would increase." 609 F.3d at 727. Because the royalty holder "suffered no antitrust injury," we affirmed summary judgment. *Id.* at 729.

Waggoner's attempt to distinguish *Bailey* is unavailing.[6] First Waggoner notes that that the oil companies in *Bailey* owned only 87% of the $CO_2$ in the McElmo dome, 555 F. Supp. 2d at 769, but Denbury allegedly owns 100% of

---

[5] We cite the district court opinion for these facts and not for its reasoning because our opinion deals with numerous issues and therefore provides a limited discussion of the antitrust claim. *See Bailey*, 609 F.3d at 727.

[6] Waggoner attempts to analogize this case to *McCready*. In that case, a beneficiary of an insurance policy purchased by her employer alleged that the insurance company's practice of denying coverage for treatment by psychologists while covering treatment by psychiatrists was part of a conspiracy to restrain competition in the market. 457 U.S. at 467. The defendants argued that the plaintiff lacked antitrust standing because her injury did not "reflect the 'anticompetitive' effect of the alleged" conspiracy, stressing that she did not claim that psychiatry costs were higher because of the alleged conspiracy. *Id.* at 481–82. The Court disagreed, finding she had standing because she was forced into the "Hobson's choice" of being treated by a psychiatrist and forfeiting reimbursement or forgoing treatment by the practitioner of her choice. *Id.* at 483. The Court held her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484.

The most salient distinction between *McCready* and the instant case is that Waggoner is not a consumer, directly or indirectly, in the $CO_2$ market. Moreover, the alleged antitrust behavior in that case was the pressure on subscribers to choose treatment from psychiatrists rather than psychologists to limit competition against psychiatrists. *Id.* Here Waggoner's alleged injury stems from the monopolist's power to "control price or exclude competition." The Defendant's sale of $CO_2$ for *low* prices is hardly the type of harm that "Congress sought to redress in providing a private remedy for" antitrust violations, *id.* at 483.

the $CO_2$ in Mississippi. Additionally, Waggoner asserts that in *Bailey* Shell was selling the gas to third parties. The case does not support this assertion, and even if this were true, it would not render *Bailey* inapplicable. Neither the district court's nor our reasoning in *Bailey* depends on Shell's share of the market or on the identity of the $CO_2$ purchasers.

*Jebaco* and *Bailey* decide this issue. As with the decrease in per-patron fees in *Jebaco*, Waggoner's decrease in royalties is the result of downstream conduct by the payor, in a market in which Waggoner is not a participant. *See* 587 F.3d at 320. More importantly, Waggoner's alleged antitrust injury is exactly the same as that alleged in *Bailey*—decreased royalty payments on $CO_2$ as a result of a conspiracy between oil companies (here, between Denbury and its affiliates). This Court unequivocally held that this is not antitrust injury. 609 F.3d at 727. Because Waggoner has failed to raise a fact issue as to antitrust standing, we affirm the district court's grant of summary judgment for Denbury on the antitrust claims.

## B. Civil Conspiracy

In addition to the antitrust claims, Waggoner alleged Denbury engaged in a conspiracy

> to create a fraudulent scheme, by which Denbury has been underpaying $CO_2$ royalty owners in the Jackson Dome, including the Plaintiffs, and as part of their fraudulent scheme, the Defendants have been over-charging working interest owners for $CO_2$ used in the tertiary recovery oil fields operated by Denbury in Southwest Mississippi and Louisiana.

Under Mississippi law, the elements of civil conspiracy are "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts;

No. 14-60310

and (5) damages as the proximate result." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004). "Mississippi follows the rule of almost all jurisdictions in uniformly requiring that civil conspiracy claims be predicated upon an underlying tort that would be independently actionable." *Ward v. Life Investors Ins. Co. of Am.*, 383 F. Supp. 2d 882, 890 (S.D. Miss. 2005) (citing *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 755 (S.D. Miss. 2002)).[7]

Waggoner alleges the underlying tort of fraud. A Mississippi fraud claim has nine elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Martin v. Winfield*, 455 So. 2d 762, 764 (Miss. 1984).

This Court, in an unpublished decision, affirmed a judgment as a matter of law on a Mississippi civil-conspiracy claim based on a fraud claim when the plaintiff failed to present any evidence of a false statement. *Aiken v. Rimkus Consulting Grp., Inc.*, 333 F. App'x 806, 811–12 (5th Cir. 2009) (per curiam).[8] So too here: Waggoner's complaint contains no allegation of a false statement, much less any of the other elements of fraud.[9] Additionally, Waggoner points

---

[7] The Mississippi Supreme Court has not spoken on whether a civil-conspiracy claim can stand where no underlying tort is alleged. *See Wells*, 217 F. Supp. 2d at 755 (surveying other states' laws).

[8] In *Aiken*, it was unclear what tort the conspiracy claim was based on, but the Court assumed it was fraud. 333 F. App'x at 812.

[9] The complaint states:

Defendants herein, have conspired to create a fraudulent scheme, by which Denbury has been underpaying $CO_2$ royalty owners in the Jackson Dome,

to no summary-judgment evidence that suggests Denbury made a fraudulent statement.

Waggoner does not contend that it properly pleaded the elements of fraud. Rather, it argues that instead of granting summary judgment, the court should have granted Waggoner leave to amend the complaint. Waggoner did not file a motion for leave to amend; it simply stated at the end of its response to Denbury's motion: "If the Court finds that the Plaintiffs have failed to plead particular elements of a claim (or that they have alleged facts without enough specificity), then the Plaintiffs would request the opportunity to amend their complaint." The district court never expressly addressed this request.

"A party who neglects to ask the district court for leave to amend cannot expect to receive such a dispensation from the court of appeals." *United States ex rel Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003). A "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Id.* (citations and internal quotation marks omitted).

In *Willard*, this court affirmed dismissal with prejudice in part on the grounds that the plaintiff's purported request for leave to amend did not satisfy the requirements of Rule 15. *Id.* The plaintiff, in his response to a motion to dismiss stated: "In any event, the only relief possibly available to it at this stage of the case is that relator replead. A court should not dismiss a plaintiff's

---

including the Plaintiffs, and as part of their fraudulent scheme, the Defendants have been over-charging working interest owners for $CO_2$ used in the tertiary recovery oil fields operated by Denbury in Southwest Mississippi and Louisiana.

10

complaint under Rule 9(b) unless the plaintiff has already been given the opportunity to amend." *Id.* The district court dismissed the complaint, stating the plaintiff "has not requested leave to amend." *Id.* at 386. Willard never filed a motion to reconsider "as part of which he could have moved to amend his complaint." *Id.* at 387. This Court affirmed for three reasons, one of which was that the statement did in the response did "not expressly request that [the plaintiff] be given leave to amend and does not provide any indication of the grounds on which such an amendment should be permitted." *Id.*

On the other hand, this Court has found sufficient under Rule 15 a statement in a response to a motion to dismiss that sought leave to "fix any infirmity" based on "information obtained during depositions of two former . . . [employees of the defendant] taken in a California state court proceeding." *Cent. Laborers' Pension v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555–56 (5th Cir. 2007). In *Central Labrorers' Pension*, the district court "did not explicitly address this request but implicitly rejected it by entering a judgment of dismissal with prejudice." *Id.* While "discoruag[ing] litigants from moving to amend in haphazard fashion," we construed the statement as a "proper motion to amend" because it "was not devoid of any indication of the grounds for amendment." *Id.* at 556.

We hold that the district court did not abuse its discretion in implicitly denying Waggoner's request for leave to amend. *See Central Laborers' Pension*, 497 F.3d at 555 ("The district court . . . implicitly rejected [the request to amend] by entering a judgment of dismissal with prejudice."). Ordinarily, "outright refusal to grant the leave without any justifying reason appearing for the denial is . . . [an] abuse of discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 181–82 (1962). But here, unlike

No. 14-60310

the request in *Central Laborers' Pension*, Waggoner's request for leave to amend was tacked on to the end of its response to Denbury's motion to dismiss and gave no indication of the grounds for amendment. This "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)," *Willard*, 336 F.3d at 387 (citations and internal quotation marks omitted). And, as in *Willard*, Waggoner did not file a motion to reconsider in which it could have requested leave to amend, attached a proposed amended complaint, or otherwise explained how it could allege a false statement. Waggoner compounds this error on appeal by neglecting to explain to this Court how it could or would allege a false statement were leave to amend granted. *See id.* ("[T]here is no indication in [the plaintiff's] briefs to this court that he will be able to allege the necessary 'who, what, when, where, and how' of the alleged fraud."). Thus, it appears leave to amend would be futile.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM.