# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 28, 2011

No. 10-20331

Lyle W. Cayce
Clerk

LHC NASHUA PARTNERSHIP, LTD.,

Plaintiff-Appellee

v.

PDNED SAGAMORE NASHUA, L.L.C. and PDNED MANAGER, L.L.C.,

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, PRADO, and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.

Defendants-Appellants PDNED Sagamore Nashua, L.L.C. and PDNED Manager, L.L.C. (collectively "PDNED") appeal a judgment entered on a jury verdict in favor of Plaintiff-Appellee LHC Nashua Partnership, Ltd. ("LHC"). The litigation arose out of a contract between the parties in which Appellant agreed to transfer its rights to Appellee to purchase shopping-mall property from a third party. Appellee alleged that, based on representations made by Appellant, Appellee expected to lease the property to Lowe's Home Improvement ("Lowe's").

After Lowe's refused to enter into the Lease and instead purchased the property from PDNED, LHC brought a breach-of-contract suit against PDNED

No. 10-20331

and also asserted claims for promissory estoppel and negligent and fraudulent misrepresentations. The district court granted judgment as a matter of law on LHC's breach-of-contract claim, but allowed LHC to proceed to trial on theories of promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation. The jury returned a verdict in favor of LHC on all three claims and awarded LHC $534,380 in "out-of-pocket" losses and $25,500,000 in "lost profits." The district court entered final judgment on the verdict. In this appeal, PDNED raises a number of challenges to the final judgment. For the following reasons, we VACATE the judgment with regard to the promissory estoppel claim and the jury's award for lost profits. However, we AFFIRM the judgment on the claims for fraudulent and negligent misrepresentation and the jury's award for out-of-pocket expenses.

I.

In June 2005, PDNED obtained an option to purchase a shopping mall property from a third party. In October 2005, PDNED entered into an agreement with Lowe's called an "Agreement to Enter Into a Ground Lease" (the "AGL"). The AGL granted Lowe's an option to execute a lease on the property for a term of 20 years with an option to renew. The AGL included a proposed, unexecuted form ground lease, of which Section 18.B required PDNED to provide Lowe's with a 30-day right of first refusal to purchase the property before PDNED sold or assigned any of its rights in the lease or the property to a third party during the term of the lease.

Armen Aftlandian was a principal of PDNED. Aftlandian had worked on similar deals with Lowe's in the past. One of Aftlandian's business strategies was to obtain the right to purchase a property, sign an agreement to enter into a ground lease with Lowe's, then transfer his right to purchase the property to a third party who would then sign the ground lease with Lowe's, thereby becoming the landlord.

No. 10-20331

This is the type of transaction that Defendant PDNED pursued with Plaintiff LHC. Some time in 2006, Aftlandian met with Howard B. Chapman as a potential buyer of the property. Aftlandian and Chapman negotiated over a period of months regarding the potential transaction. Chapman later formed LHC for the purpose of purchasing the property.

According to LHC's assertions in this suit, during negotiations Aftlandian represented to Chapman that in transactions of this type, Lowe's "never buys" similar properties, but rather always signs the ground lease with the new purchaser. PDNED's lawyers told Chapman that Lowe's signing the ground lease was nothing more than a "ministerial act" that would occur at the closing of LHC's deal with PDNED.

On August 16, PDNED provided Lowe's with written notice of its intent to sell the property. The notice stated that Lowe's could exercise its right of first refusal to purchase the property "pursuant to Section 18.B of the form of Ground Lease attached to the [AGL] . . . ." The notice acknowledged, however, that the right of first refusal provision in the unexecuted ground lease was not "in full force with respect to the contemplated transfer."[1] Lowe's never responded to this notice.

On September 18, 2006, PDNED and LHC[2] entered into the purchase and sale agreement for the property (the "P&S Agreement"). Section 5.1 of the P&S Agreement expressly included as "conditions to closing" that (1) Lowe's execute and deliver the proposed lease attached to the AGL; and (2) Lowe's provide a written waiver of its right of first refusal to purchase the property pursuant to

---

[1] The unexecuted lease provided that Lowe's would lease for an initial term of 20 years, and if the landlord intended to sell during the term, Lowe's would have the right of first refusal to purchase the property. Since Lowe's never signed the lease, this provision was never enforceable on its face.

[2] Chapman formed LHC on August 31, 2006.

No. 10-20331

Section 18 of the proposed lease.  Section 9.3 of the P&S Agreement also stated that "[t]his Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the Premises . . . ."

The P&S Agreement set a closing date of October 13, 2006.  On September 19, the day after signing the P&S Agreement, LHC provided PDNED with a proposed waiver of the right of first refusal for Lowe's to sign.  However, Lowe's never signed it.  PDNED assured LHC that Lowe's had agreed "in substance" and that PDNED would use good faith, commercially reasonable efforts to cause the closing with Lowe's.

During this time, LHC secured financing in preparation for closing. Chapman planned to invest $6,914,000 of his own money.  He submitted a loan application for the balance of $19,250,000.  The loan included the condition that LHC would provide the lender with a lease signed by Lowe's ten days prior to closing.

PDNED continued to assure LHC that it was "continuing to work through the process" of getting approval from Lowe's.  However, Lowe's was apparently displeased with PDNED.  Lowe's expressed objections to PDNED assigning its rights to a third party and leaving Lowe's with a "strange" landlord.  Lowe's threatened PDNED with a loss of future business.

As Lowe's continued to refuse to sign the waiver, LHC and PDNED agreed to a series of extensions of the closing date.  On October 30, Aftlandian told Chapman that Lowe's had indicated it might want to purchase the property.  In response, Chapman asserted that Lowe's had already waived its right of first refusal. Aftlandian disagreed, referring to the condition in the P&S Agreement calling for Lowe's to waive its right of first refusal in writing.  On November 6, Aftlandian offered to return Chapman's deposit and terminate the deal, but Chapman stated that he wanted to "see what Lowe's has got to say."

4

No. 10-20331

On November 14, Lowe's confirmed that it wanted to purchase the property. Aftlandian informed Chapman of this fact, but Chapman continued to hold out hope that Lowe's would "perform." Finally, on December 5, LHC canceled its loan application, incurring fees in connection with this cancellation. Thereafter, Lowe's bought the property from PDNED.

LHC later filed this suit, raising claims for breach of the P&S Agreement, promissory estoppel, negligent misrepresentation, and fraudulent misrepresentation. LHC argued that PDNED had breached its promises to deliver the property and the ground lease. In support of its misrepresentation claims, LHC produced evidence that Aftlandian worked on a number of previous deals with Lowe's and that contrary to Aftlandian's statements to Chapman, Lowe's, in fact, bought rather than leased three of the properties.

PDNED defended these claims primarily on the basis of the provisions of the P&S Agreement requiring production of a signed lease and a written waiver of Lowe's right of first refusal as "conditions to closing." At the close of evidence, the district court granted PDNED's motion for judgment as a matter of law on the breach-of-contract claim because of the failure of these conditions to occur. The court determined that these were "conditions precedent" to the parties' performance. However, the district court denied PDNED's motion for judgment as a matter of law with respect to the promissory estoppel and misrepresentation claims and ruled that these claims would be submitted to the jury.

During trial on these remaining claims, LHC provided testimony regarding the fees it had incurred from its lender and the tax liabilities it sustained as a result of the deal falling through. LHC also provided expert testimony and a report estimating the expected profits from the transaction that LHC lost. The district court instructed the jury on the three remaining claims

No. 10-20331

under New Hampshire law.[3] The court instructed the jury that compensatory damages consisted of LHC's out-of-pocket expenses and that the jury could consider adding an award of lost profits in the event it found in favor of LHC on the promissory estoppel or fraudulent misrepresentation claims. The jury found PDNED liable for all three claims[4] and awarded LHC $534,380 in out-of-pocket costs and $25,500,000 in lost profits.

The district court denied PDNED's subsequent motion for judgment as a matter of law on all three claims and its motion for a new trial. The court entered a final judgment against PDNED on the verdict. PDNED then filed the present appeal.

PDNED argues that the district court erred in several ways, including that (1) the court erroneously applied New Hampshire law instead of Texas law to all three of LHC's claims; (2) the court erred by denying PDNED's motion for judgment as a matter of law regarding LHC's promissory estoppel claim because the claim covers the same subject matter as the breach-of-contract claim and is barred by the P&S Agreement's merger clause; (3) for similar reasons, the court erred by denying PDNED's motion for judgment as a matter of law regarding LHC's negligent and fraudulent misrepresentation claims; (4) the court erred by

---

[3] The P&S Agreement contained a choice-of-law clause naming New Hampshire law.

[4] The jury answered "yes" to the following three questions:

Question No. 1: Do you find by a preponderance of the evidence that PDNED Sagamore Nashua, LLC and PDNED Manager, LLC made a negligent misrepresentation on which LHC Nashua Partnership, Ltd. justifiably relied?

Question No. 2: Do you find by clear and convincing evidence that PDNED Sagamore Nashua, LLC and PDNED Manager, LLC made a fraudulent misrepresentation on which LHC Nashua Partnership Ltd. justifiably relied?

Question No. 3: Do you find by a preponderance of the evidence that PDNED Sagamore Nashua, LLC and PDNED Manager, LLC are liable to LHC Nashua Partnership, Ltd. under the theory of promissory estoppel?

6

No. 10-20331

failing to instruct the jury on the law of ratification; and (5) the court erred by failing to award PDNED its attorneys' fees incurred in defending the failed breach-of-contract claim.

## II.

We review choice-of-law questions *de novo*, although the district court's factual determinations are reviewed for clear error. *Baily v. Shell W. E&P Inc.*, 609 F.3d 710, 722 (5th Cir. 2010).

Denial of a motion for judgment as a matter of law is reviewed *de novo*. *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008). A motion for judgment as a matter of law should be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004). The court's "standard of review with respect to a jury verdict is especially deferential." *SMI*, 520 F.3d at 437. The court is to "review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001).

Regarding the amount of damages awarded, legal conclusions underlying the award are reviewed *de novo*. *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 479 (5th Cir. 2006). "Absent an error of law, the reviewing court will sustain the amount of damages awarded by the fact finder, unless the amount is clearly erroneous or so gross or inadequate as to be contrary to right reason." *Stockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994). "Thus, reversal is proper only if no reasonable jury could have arrived at the verdict." *Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 405 (5th Cir. 2003).

7

No. 10-20331

### III.

### A.

PDNED first argues that the district court erred by applying New Hampshire law rather than Texas law to LHC's claims. On our *de novo* review of this choice-of-law question we apply the forum state's conflicts-of-law rules to determine which state's law governs. *Baily*, 609 F.3d at 722. Under the conflict rules of Texas, we need not decide whether New Hampshire or Texas law governs if our conclusions would be the same under either state's law. *Id.* (quoting *Sava Gumarskain Kemijska Industria D.D. v. Advanced Polymer Scis, Inc.*, 128 S.W.3d 304, 314 (Tex. App. – Dallas 2004, no pet.) ("[W]e should first determine if the laws are in conflict. If the result would be the same under the laws of either jurisdiction, there is no need to resolve the choice of law question.")).

The parties agree that, with a few exceptions, no material differences exist between New Hampshire and Texas law with regard to this case.[5] However, as explained more fully below, none of these exceptions is relevant to our analysis. Because our conclusions regarding PDNED's challenges to the district court's final judgment would be the same under either New Hampshire or Texas law, we need not resolve the choice-of-law question.

### B.

PDNED argues next that the district court erred by denying its motion for judgment as a matter of law on LHC's promissory estoppel claim. PDNED contends the promissory estoppel claim fails as a matter of law because it covers the same subject matter as LHC's unsuccessful claim for breach of the P&S Agreement. We agree.

---

[5] The parties agree that the most notable exception is that Texas generally does not permit lost-profits damages for promissory estoppel. However, our disposition of the promissory estoppel claim renders this difference between the two states' laws irrelevant.

No. 10-20331

LHC argued at trial that PDNED promised to "deliver the ground lease" and "deliver the property." Promissory estoppel "serves to impute contractual stature based upon an underlying promise, and to provide a remedy to the party who detrimentally relies on the promise." *Great Lakes Aircraft* Co. *v. City of Claremont*, 608 A.2d 840, 853 (N.H. 1992). But the New Hampshire Supreme Court has held that "in all instances, application of promissory estoppel is appropriate only in the absence of an express agreement." *Id.* As one district court has noted, New Hampshire adheres to the rule that "enjoys near-universal acceptance in American jurisdictions: promissory estoppel is not available in the case of an express, enforceable agreement between the parties covering the same subject matter." *Rockwood v. SKF USA, Inc.*, 758 F. Supp. 2d 44, 58 (D.N.H. 2010) (citing *Great Lakes*, 608 A.2d at 853).[6] New Hampshire has carved out exceptions to this rule only in cases involving promises made with regard to contracts that are unenforceable or "otherwise defective." *Id.*[7]

This basic rule bars LHC's promissory estoppel claim because the P&S Agreement was a binding, enforceable contract expressly governing the

---

[6] It is axiomatic in all jurisdictions that "[p]romissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984). Texas adheres to the same general rule. *See Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385 (5th Cir. 1990) ("Under Texas law, a contract comprising the disputed promise precludes recovery under promissory estoppel.").

[7] In *Great Lakes*, the New Hampshire Supreme Court described the types of promises made with regard to an unenforceable or "defective" contract that could become enforceable under a theory of promissory estoppel:

Traditionally, courts have applied promissory estoppel in order to enforce promises when consideration is lacking. More recently, however, its application has been expanded to enforce promises underlying otherwise defective contracts and promises made during the course of preliminary negotiations. In some instances, it has been employed to provide a remedy for reliance upon offers subsequently withdrawn.

608 A.2d at 853 (internal citations omitted).

No. 10-20331

transaction. The district court held that PDNED did not breach the P&S Agreement because of the P&S Agreement's express conditions precedent that Lowe's sign a lease and deliver a written waiver of its right of first refusal to buy the property did not occur, thereby relieving both parties of their obligation to perform. *See, e.g., In re Estate of Kelly*, 547 A.2d 284, 289 ("Conditions precedent are those facts and events, occurring subsequently to the making of a valid contract, than must occur before there is a right to performance.") (internal quotation marks and citations omitted). LHC has not cross-appealed the district court's dismissal of the breach-of-contract claim. Nor has LHC made a persuasive argument on appeal that the P&S Agreement was somehow unenforceable or "otherwise defective" as defined by the New Hampshire Supreme Court in *Great Lakes.* Accordingly, the P&S Agreement precludes LHC's promissory estoppel claim because the agreement itself controlled the extent of PDNED's binding promises with regard to the purchase and sale of the property.

## C.

PDNED argues next that the district court erred by denying PDNED's motion for judgment as a matter of law on LHC's negligent and fraudulent misrepresentation claims. PDNED makes a number of challenges to the misrepresentation claims, most of which overlap with its arguments regarding the promissory estoppel claim. As explained below, LHC's misrepresentation causes of action differ in certain key respects from the promissory estoppel claim. Thus, we affirm the judgment against PDNED for negligent and fraudulent misrepresentation.

## 1.

Under New Hampshire law, "[t]o establish fraud, a plaintiff must prove that the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely

No. 10-20331

upon it." *Snierson v. Scruton*, 761 A.2d 1046, 1049 (N.H. 2000). To prove negligent misrepresentation, a plaintiff must show "a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." *Id.* at 1049-50. Texas law establishes essentially the same elements, with the additional requirement that the defendant make the misrepresentation in the course of business and the plaintiff suffer pecuniary loss.[8]

LHC argued to the jury that it was induced to enter into the P&S Agreement and into taking a number of related actions based on PDNED's misrepresentations. Both New Hampshire and Texas widely recognize claims where a party has been induced into a contract by the other party's negligent or fraudulent misrepresentations of fact. *See, e.g., Akwa Vista, LLC v. NRT, Inc.*, 8 A.3d 97 (N.H. 2010) (involving a plaintiff induced into a contract by negligent misrepresentations); *Formosa Plastics Corp. United States v. Presidio Eng'rs & Contrs., Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (involving a fraudulent inducement claim).

2.

A plaintiff must prove justifiable reliance to prevail on a misrepresentation claim under the law of most states, including New Hampshire and Texas. *See, e.g., Snierson*, 761 A.2d 1049; *Exxon Corp. v. Emerald Oil & Gas Co.*, 2011 Tex. LEXIS 250, *63-65 (Tex. April 1, 2011); *see also Field v. Mans*, 516 U.S. 59, 69 (1995) (discussing the justifiable reliance standard under a majority of state laws); RESTATEMENT (SECOND) OF TORTS § 537 (1977) ("The recipient of a

---

[8] "The elements of a cause of action for [negligent misrepresentation] are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable."). The justifiable reliance standard differs from the reasonable reliance standard and is somewhat "less demanding." *Field*, 516 U.S. at 63, 69-76 (1995) (explaining the difference between justifiable reliance and reasonable reliance under the common law, citing extensively the RESTATEMENT (SECOND) OF TORTS and state law). We are persuaded that, under this standard, the jury was entitled to conclude that Chapman justifiably relied on misrepresentations that Aftlandian made

The jury heard testimony that on multiple occasions Aftlandian told Chapman that Lowe's "never buys" the property in a transaction of this nature. LHC produced witness testimony that Aftlandian's statements were knowingly false because Lowe's had previously bought three properties from him in transactions such as this one.

Chapman has consistently argued that he viewed Aftlandian's statements that Lowe's "never buys" as material to his decision to enter into the P&S Agreement and make preparations for purchasing the property. A party entering into a contract may justifiably rely on statements that are material to the transaction. *See* RESTATEMENT OF TORTS (SECOND) § 538. "A matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Id*.

The jury was entitled to find that Chapman reasonably attached importance to these statements because if it had been true that Lowe's had a history of never buying similar properties, as Aftlandian represented, Chapman could have reasonably expected Lowe's would not buy this particular property

but would rather lease it, thereby resulting in a profitable transaction. The evidence also suggests that Aftlandian knew Chapman would attach importance to such representations, which is why he repeatedly assured Chapman that Lowe's never buys similar properties. Moreover, the P&S Agreement was silent regarding whether Lowe's had ever purchased property from Aftlandian or PDNED, so the written agreement did not preclude Chapman from relying on Aftlandian's representations in this regard.

Thus, giving deference to the jury's verdict and making all reasonable inferences in favor of LHC, we are persuaded that the jury was entitled to find that Chapman justifiably relied on Aftlandian's material misrepresentations that Lowe's "never buys." The jury could have reasonably concluded that Chapman would not have gone to the time, trouble, and expense of entering into the P&S Agreement and making related arrangements to purchase the property if Aftlandian had not made these misrepresentations.

3.

PDNED has not demonstrated that the P&S Agreement's merger clause bars LHC's claim that it entered into the agreement because of PDNED's misrepresentations. The merger clause states that the P&S Agreement "supersedes all prior agreements and understandings" and constitutes the "entire agreement." PDNED relies on the Texas law of merger clauses. However, the Texas Supreme Court recently held that "standard" merger clauses "without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011). The merger clause in the P&S Agreement is a "standard" merger clause as defined by the Texas Supreme Court.

No. 10-20331

The Texas Supreme Court explained in *Italian Cowboy* that a "standard merger clause" is one that "achieves the purpose of ensuring that the contract at issue invalidates or supersedes any previous agreements, as well as negat[es] the apparent authority of an agent to later modify the contract's terms." *Id.* The court held that the clauses at issue were "standard" clauses that served these purposes, but did not perform the additional function of negating a fraudulent inducement claim. *Id.* at 333-37. To perform the latter function, the court held that a clause must expressly disclaim reliance on prior representations or expressly waive fraud claims. *Id.* The court determined that the clauses at issue did not disclaim reliance on prior representations or waive fraud claims even though the clauses stipulated that the parties had not "made any representations or promises" and that the contract constituted "the entire agreement." *Id.*

Similarly, the P&S Agreement's merger clause states that the agreement supersedes previous "agreements" and "understandings" and constitutes the "entire agreement." But the clause makes no mention of "representations" and does not expressly disclaim reliance on any representations nor expressly waive fraud claims. Thus, under the exacting requirements announced in *Italian Cowboy*, the P&S Agreement's merger clause is only a "standard" merger clause and not a "disclaimer-of-reliance" clause.

The New Hampshire Supreme Court has likewise held that "a standard merger clause" does not "bar[] an action for fraud." *Van Der Stok v. Van Voorhees*, 866 A.2d 972, 975 (N.H. 2005). The New Hampshire Supreme Court even rejected the proposition endorsed by the Texas Supreme Court, discussed above, that a specific disclaimer of reliance on previous representations negates a claim for fraudulent misrepresentation. *Id.* at 682-83. Instead, New Hampshire adheres to the rule that fraud "vitiates" the parties' entire agreement, including a purported disclaimer of reliance. *See id.*

14

No. 10-20331

The P&S Agreement's merger clause, therefore, does not bar LHC's fraudulent misrepresentation claim under either Texas or New Hampshire law. Moreover, PDNED has cited no authorities from either state establishing that the clause bars a claim for negligent misrepresentation.

4.

We also reject PDNED's argument that LHC ratified the P&S Agreement after learning of the misrepresentations, which would have foreclosed LHC's right to sue.[9] PDNED points out that after the P&S Agreement was signed but before the initial closing date, Aftlandian informed Chapman numerous times that Lowe's might not sign the lease and might instead buy the property. Yet Chapman agreed to several extensions of the closing date in order to give Lowe's a chance to "perform." PDNED contends that Chapman's agreement to these extensions constituted ratification of the P&S Agreement.

LHC again relies on Texas law. "Under Texas law, [r]atification occurs 'when one, induced by fraud to enter into a contract, continues to accept benefits under the contract after he becomes aware of the fraud, or if he conducts himself in such a manner as to recognize the contract as binding.'" *Olney Sav. & Loan Assoc. v. Trinity Banc Sav. Assoc.*, 885 F.2d 266, 271 (5th Cir. 1989) (quoting *Johnson v. Smith*, 697 S.W.2d 625 (Tex. App. – Houston [14th Dist.] 1985, no writ)). But one seeking to prove ratification "ha[s] the burden to prove knowledge of the fraud and a voluntary, intentional choice to ratify the [contract] in light of that knowledge." *Johnson*, 697 S.W.2d at 630. "The key question is whether decedent had *full knowledge* of the fraudulent acts at the time of ratification." *Id.* (emphasis in original).

A jury could have found that Chapman knew Lowe's might not lease the property when he agreed to extend the closing date. However, no record

---

[9] Appellant asked the district court to include a question on the special verdict form on ratification and the court declined to do so.

evidence suggests that Chapman had "full knowledge" of Aftlandian's fraudulent statements, which is the "key question." *Johnson,* 607 S.W.2d at 630. The jury could not have reasonably found that Chapman knew Aftlandian made false statements about Lowe's "never" buying similar properties. Thus, the district court did not commit reversible error under Texas law by failing to submit the ratification question to the jury. *See Sawyer,* 580 S.W.2d at 123 ("If the evidence of ratification is uncontroverted or uncontrovertible, then the question of ratification could be determined as a matter of law.").

Furthermore, LHC has demonstrated that New Hampshire's law of ratification poses even less of an obstacle than Texas law to LHC's misrepresentation claims. Under New Hampshire law, "[w]hile ratification may deprive a party of contractual remedies, it does not deprive a party of tort remedies." *Green v. Sumner Props., LLC*, 873 A.2d 497, 499 (N.H. 2005) ("Thus, even if we assume that the [plaintiff] ratified the lease, he was still entitled to seek tort damages for the [defendant's] misrepresentation.") (internal citations omitted).

5.

In sum, the district court did not err when it denied PDNED's motion to dismiss LHC's negligent and fraudulent misrepresentation claims as a matter of law. The evidence presented at trial was sufficient to support finding PDNED liable for negligent and fraudulent misrepresentations. Therefore, we affirm the judgment against PDNED on these claims.

D.

Next, we address the proper measure of damages under our holding that LHC's promissory estoppel claim fails as a matter of law, leaving only LHC's claims for negligent and fraudulent misrepresentation. PDNED challenges the jury's damages award, arguing in particular that LHC was not entitled to an award of lost profits. PDNED also argues that the jury erroneously calculated

No. 10-20331

the out-of-pocket and lost-profits awards.  For the following reasons, we affirm the out-of-pocket award and vacate the lost-profits award.

1.

"[O]ne who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." *Gray v. First NH Banks*, 640 A.2d 276, 279 (N.H. 1994) (quoting RESTATEMENT (SECOND) OF TORTS § 525 (1977)). "Similarly, 'one who, in the course of his business . . . supplies false information for the guidance of others in their business transaction [through negligent misrepresentations], is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . . .'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 552).

The Restatement defines the measure of recoverable pecuniary loss for fraudulent misrepresentations:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance on the misrepresentation.
> (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

17

No. 10-20331

RESTATEMENT (SECOND) OF TORTS § 549.[10]   The Restatement refers to the measure of loss in § 549 (1)(a) as the "out-of-pocket rule" and the measure of loss in § 549 (2) as the "benefit-of-the-bargain" rule." *See id.*, cmts. b, g.

New Hampshire recognizes both measures of damages for fraudulent and negligent misrepresentation, including cases where a plaintiff has been induced into a transaction by the other party's misrepresentations. *See Eno Brick Corp. v. Barber-Greene Co.,* 245 A.2d 545, 548 (N.H. 1968) (discussing both measures of damages with regard to a claim that a party was induced into a contract based on negligent misrepresentations) (citing *Lampesis v. Comolli*, 140 A.2d 561 (N.H. 1958)).   Similarly, "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics*, 960 S.W.2d at 49 (involving a claim for fraudulent inducement).  This "benefit-of-the bargain measure can include lost profits . . . that would have been made if the bargain had been performed as promised." *Id.* at 50.  Texas does not recognize benefit-of-the bargain damages for negligent misrepresentation. *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex. 1998).

2.

Under either New Hampshire or Texas law, therefore, the jury was entitled to award LHC the out-of-pocket pecuniary losses it suffered as a consequence of relying on PDNED's fraudulent and negligent misrepresentations.  The evidence supports the jury's conclusion that, in the absence of PDNED's misrepresentations, LHC would not have encountered various expenses such as the fees LHC incurred from its lender in preparation

---

[10]   The Restatement similarly defines the measure of recoverable pecuniary loss for negligent misrepresentations, but with the caveat that "the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant." *Id.* at § 552B.

## No. 10-20331

for purchasing the property. Thus, the jury's out-of-pocket award was the appropriate measure to compensate LHC for these reliance costs.[11]

The New Hampshire Supreme Court's most recent opinion addressing a negligent misrepresentation claim provides an example. The court permitted the plaintiff to recover those damages it had suffered as a result of being induced into a contract related to the sale and marketing of real estate based on the other party's negligent misrepresentations. *Akwa Vista*, 8 A.3d at 103. The damages placed the plaintiff back in the position it occupied before relying on the defendant's misrepresentations. *Id.* at 104. Similarly, LHC may recover the out-of-pocket expenses it incurred in connection with its preparations to purchase the property. Such an award restores LHC to the position it occupied before relying on PDNED's misrepresentations. *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 549, cmt. g (explaining that the out-of-pocket rule is designed to "compensate for loss sustained and to restore the plaintiff to his former position . . .").

LHC incurred an $84,025.54 "blowup fee" and an $18,608 "standby fee" from its lender when LHC cancelled the loan it had secured in anticipation of purchasing the property. Chapman also testified that he incurred a $399,000 tax liability on the sale of two other properties that he planned to exchange with the Lowe's property under Section 1031 of the Internal Revenue Code. Pursuant to Section 1031, a party may exchange properties in such a way as to defer capital gains taxes from the sale of a property. Chapman testified that when the sale failed to close, the period for designating an exchange property for the two

---

[11] *See* RESTATEMENT (SECOND) OF TORTS § 549, cmt. b. (stating that under the out-of-pocket rule "the recipient of a fraudulent misrepresentation is entitled to recover from its maker in all cases the actual out-of-pocket loss which, because of its falsity, he sustains through his action or inaction in reliance on it."); *see also id.*, cmt. d (stating that the "indirect" or "consequential" damages contemplated by § 549 (1)(b) are recoverable if they "might reasonably be expected to result from reliance upon the misrepresentation.").

other properties had already expired, leaving Chapman with no ability to designate another property for exchange. At that point, Chapman was obligated to pay the $399,000 tax liability on the two other properties.

The evidence reasonably supports the jury's determination that LHC incurred these fees and taxes upon its expectation that the deal would close in reliance on PDNED's representations. PDNED has failed to persuade us that, under our highly deferential review of the verdict, the jury's $534,380 award for out-of-pocket expenses is clearly erroneous. A reasonable jury could have found that LHC suffered this amount of loss as a result of relying on PDNED's misrepresentations. Therefore, we affirm the jury's award of $534,380 in out-of-pocket damages.

3.

Lost profits, however, is not an appropriate measure of damages for the fraudulent misrepresentations in this case.[12] The Restatement makes clear that out-of-pocket damages and those suffered in reliance on the defendant's fraudulent misrepresentations constitute the usual measure of damages.

> Subsection (1) states the rules normally applicable to determine the measure of damages recoverable for a fraudulent misrepresentation in tort action of deceit. If the plaintiff is content with these damages, he can always recover them. The rules stated in Subsection (1) are the logical rules for tort action, since the purpose of a tort action is to compensate for loss sustained and to restore the plaintiff to his former position, and not to give him the benefit of any contract he has made with the defendant.

RESTATEMENT (SECOND) OF TORTS § 549, cmt. g. The Restatement goes on to explain that "[w]hen the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in  dealing with a third person, these are the rules [in

---

[12] The district court instructed the jury not to consider lost profits for the negligent misrepresentation claim. LHC had not cross-appealed that instruction.

Subsection (1)] that must of necessity be applied." *Id.* Benefit-of-the bargain damages are appropriate in situations when the normal rules "do not afford compensation that is just and satisfactory." *Id.* The Restatement gives examples of such situations, but none correspond to the facts of the present case. In all of these examples, the fraudulent transaction was completed, leaving the plaintiff with ownership of a bargained-for item of less value than the defendant represented. *See id.* cmts. g-l; illus. 4-5.

In light of these basic principles, benefit-of-the-bargain damages are unavailable to LHC in this case. Although PDNED induced LHC into signing the P&S Agreement—the contract to buy—the transaction transferring the property was never entered into. LHC never bought the property. Therefore, LHC did not suffer any losses as a result of owning the property. Instead, LHC suffered pecuniary losses in reliance upon PDNED's representations (when dealing with third parties, such as the lender) in anticipation of purchasing the property. The out-of-pocket award compensates LHC for these losses.

Texas case law generally illustrates this idea. In *Formosa Plastics*, the Texas Supreme Court held that a plaintiff could not recover lost profits "in a hypothetical bargain never struck." 960 S.W.2d at 49-50.[13] In *ISG State Operations Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 717 (Tex. App.– Eastland 2007, pet. denied), the plaintiff argued that it was induced to sign a subcontract with the promise that it would be awarded yet another separate contract that would have resulted in a profit. The court explained that "the basis of any fraudulent inducement claim must be an executed contract that was procured by fraud, without which [the contract] would not have been executed, and the damages must flow directly from *that* contract." *Id.* (emphasis in

---

[13] The court made this comment in the context of its discussion of the out-of-pocket rule, but this statement applies equally to the benefit-of-the-bargain rule.

original).  The court held that the plaintiff could not recover lost profits for a second, "unexecuted contract" based upon a fraudulent inducement claim.  *Id.*

Under this reasoning, LHC's lost profits did not flow directly from the P&S Agreement.  The P&S Agreement contemplated a future closing transaction whereby PDNED would convey all its rights in the property to LHC.  The parties never consummated the actual transfer at closing because the express conditions of the P&S Agreement never materialized.[14]  LHC cannot recover lost profits flowing from such an anticipated agreement under Texas law.  *See ISG*, 234 S.W.3d at 717.

There is no reason to conclude that New Hampshire law is different.  LHC has cited no authorities approving of lost-profits damages in an analogous situation.  In comparable New Hampshire cases, the plaintiffs were awarded out-of-pocket damages.  *See Akwa Vista*, 8 A.3d at 103; *Eno Brick*, 245 A.2d at 548.  And in each of those cases, the tainted transaction was completed, leaving the plaintiff with damages flowing from *that* transaction.  In *Eno Brick*, for instance, the plaintiff bought a product from the defendant that did not work as represented by the manufacturer.  245 A.2d at 548.  Here, LHC never bought the property, so the benefit-of-the-bargain measure simply has no application at all.  LHC cannot recover lost profits flowing from an agreement to purchase property that never closed due to the failure of that agreement's express conditions.

---

[14] The agreement to transfer the property was essentially a conditional, unperformed agreement.  *See, e.g., Blackstone v. Thalman*, 949 S.W.2d 470, 472 n.3 (Tex. App.- Houston [14th Dist.] 1997, no pet.) (holding that a realtor's listing agreement was a conditional contract and clarifying that "[a] conditional contract is an executory contract, the performance of which depends on a condition.").  "An executory contract is one that remains wholly unperformed or for which there remains something still to be done on both sides.  An executed contract is one that has been entirely performed on one side."  Bryan A. Garner, GARNER'S DICTIONARY OF LEGAL USAGE, 340 (3d ed. 2011).

No. 10-20331

E.

Finally, we address PDNED's argument that the district court erred by denying PDNED's motion to recover attorneys' fees for the cost of defending LHC's failed breach-of-contract claim. PDNED filed the motion pursuant to a provision of the P&S Agreement providing that "[i]f either party hereto shall be required to employ an attorney to enforce or defend the rights of such party hereunder, the prevailing party shall be entitled to recover its reasonable attorneys' fees."

Even though LHC failed to prove its breach-of-contract claim, permitting PDNED to seek a benefit under a provision of the P&S Agreement is incompatible with the jury's determination that PDNED fraudulently induced LHC into that agreement. *See generally Van Der Stok*, 866 A.2d at 975 (holding that fraud vitiates contractual obligations); *Italian Cowboy*, 341 S.W.3d at 331 ("A contract is subject to avoidance on the ground of fraudulent inducement."). Given the jury's verdict in favor of LHC, PDNED cannot be considered the "prevailing party" in this litigation for purposes of the P&S Agreement's attorneys' fees provision.

IV.

For all of the foregoing reasons, we VACATE the district court's judgment against PDNED on LHC's promissory estoppel claim and the jury's award of $25,500,000 in lost-profits damages; we AFFIRM the district court's judgment against PDNED on LHC's negligent and fraudulent misrepresentation claims and the jury's award of $534,380 in out-of-pocket damages; and we AFFIRM the district court's denial of PDNED's motion for attorneys' fees.[15]

We REMAND this case to the district court for entry of judgment consistent with this opinion.

---

[15] Appellee's motion to strike a portion of appellant's brief is DENIED.

No. 10-20331

AFFIRMED in part.

VACATED in part.

REMANDED.